UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

```
┌─────────────────────────────┐
│          FILED              │
│   ┌─────────────────────┐   │
│   │    MAY  3 2012       │   │
│   └─────────────────────┘   │
│  CLERK, U.S. DISTRICT COURT │
│        NORFOLK, VA          │
└─────────────────────────────┘
```

IHANCE, INC.,

      Plaintiff,

v.                                    Civil Action No. 2:11cv257

ELOQUA LIMITED and
ELOQUA CORPORATION,

      Defendants.

## OPINION AND ORDER

On December 8, 2011, the Court conducted a Markman hearing for the purpose of construing eleven disputed claims in the two patents at issue in this case. After careful consideration of the briefs submitted by the parties and the arguments advanced at the Markman hearing, the Court afforded the parties an opportunity to submit supplemental Markman briefs as to the final two disputed terms. Having now received such briefs, and having carefully considered the record before the Court, the Court issues this Opinion and Order detailing the claim constructions in this case.

### I. FACTUAL AND PROCEDURAL BACKGROUND

At issue in this case are two patents titled "Method and System for Monitoring E-mail and Website Behavior of an E-mail Recipient," patent numbers 7,072,947 ("'947") and 7,076,533 ("'533"). The '947 patent appears to be primarily focused on monitoring email behavior whereas the '533 patent appears to be

primarily focused on monitoring website behavior. Both patents share the same specification. Plaintiff iHance, Inc. ("iHance") and Defendants Eloqua Limited and Eloqua Corporation (collectively "Eloqua") are companies that provide software and services in the field of "demand generation solutions," which involves helping other companies focus their marketing and sales programs. (Compl. ¶¶ 10-11).

In the instant patent infringement action, iHance alleges that approximately ten years ago, Eloqua and iHance considered partnering together, and that in 2002: (1) provided Eloqua a demonstration of its product and services; and (2) informed Eloqua that iHance had filed a provisional patent application covering such invention. (Compl. ¶¶ 26-28). iHance alleges that Eloqua thereafter broke off communications with iHance, and several months later, Eloqua purportedly announced the availability of its new competing product, which iHance asserts infringes on the two patents in suit. (Compl. ¶¶ 29-30, 34). After iHance's patents issued in 2006, iHance alleges that it notified Eloqua of its infringement, but that Eloqua did not cease infringing. (Compl. ¶¶ 34-35). Both of iHance's patents successfully survived a Patent and Trademark Office ("PTO") reexamination that was concluded in 2009 as to the '947 patent, and in 2011 as to the '533 patent. Following the conclusion of the '533 reexamination, iHance filed the instant suit.

## II. CLAIM CONSTRUCTION PROCEDURE

In <u>Markman v. Westview Instruments</u>, the United States Supreme Court succinctly explained the basis for, and importance of, claim construction:

> The Constitution empowers Congress "[t]o promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." Art. I, § 8, cl. 8.  Congress first exercised this authority in 1790, when it provided for the issuance of "letters patent," Act of Apr. 10, 1790, ch. 7, § 1, 1 Stat. 109, which, like their modern counterparts, granted inventors "the right to exclude others from making, using, offering for sale, selling, or importing the patented invention," in exchange for full disclosure of an invention, H. Schwartz, Patent Law and Practice 1, 33 (2d ed. 1995). It has long been understood that a patent must describe the exact scope of an invention and its manufacture to "secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them." <u>McClain v. Ortmayer</u>, 141 U.S. 419, 424 (1891).  Under the modern American system, these objectives are served by two distinct elements of a patent document.  First, it contains a specification describing the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art . . . to make and use the same."   35 U.S.C. § 112; <u>see also</u> 3 E. Lipscomb, Walker on Patents §10:1, pp. 183–184 (3d ed. 1985) (Lipscomb) (listing the requirements for a specification).  Second, a patent includes one or more "claims," which "particularly poin[t] out and distinctly clai[m] the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. "A claim covers and secures a process, a machine, a manufacture, a composition of matter, or a design, but never the function or result of either, nor the scientific explanation of their operation."   6 Lipscomb § 21.17, at 315–316.  The claim "define[s] the scope of a patent grant," 3 <u>id.</u> § 11:1, at 280, and functions to forbid not only exact copies of an invention, but products that go to "the heart of an invention but avoids the literal language of the claim

by making a noncritical change," Schwartz, <u>supra</u>, at 82. . . .

Characteristically, patent lawsuits charge what is known as infringement, Schwartz, <u>supra</u>, at 75, and rest on allegations that the defendant "without authority ma[de], use[d] or [sold the] patented invention, within the United States during the term of the patent therefor . . . ." 35 U.S.C. § 271(a). Victory in an infringement suit requires a finding that the patent claim "covers the alleged infringer's product or process," which in turn necessitates a determination of "what the words in the claim mean." Schwartz, <u>supra</u>, at 80; <u>see also</u> 3 Lipscomb § 11:2, at 288-290.

<u>Markman v. Westview Instruments</u>, 517 U.S. 370, 373-74 (1996).

It is well-settled that a determination of infringement requires a two-step analysis: "First, the court determines the scope and meaning of the patent claims asserted" and second, "the properly construed claims are compared to the allegedly infringing device." <u>Cybor Corp. v. FAS Techs., Inc.</u>, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc) (citing <u>Markman</u>, 517 U.S. at 371-73). In conducting this analysis, it must be remembered that "[i]t is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting <u>Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.</u>, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); <u>see</u> <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").

4

## A.   Claim Construction Principles

The Federal Circuit has repeatedly stated that "the words of a claim 'are generally given their ordinary and customary meaning,'" and that "the ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." Phillips, 415 F.3d at 1312-13 (quoting Vitronics, 90 F.3d at 1582). This provides "an objective baseline from which to begin claim interpretation" and is based upon "the well-settled understanding that inventors are typically persons skilled in the field of the invention and that patents are addressed to and intended to be read by others of skill in the pertinent art." Id. at 1313. As noted by the Federal Circuit:

> It is the person of ordinary skill in the field of the invention through whose eyes the claims are construed. Such person is deemed to read the words used in the patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field. The inventor's words that are used to describe the invention—the inventor's lexicography—must be understood and interpreted by the court as they would be understood and interpreted by a person in that field of technology. Thus the court starts the decisionmaking process by reviewing the same resources as would that person, viz., the patent specification and the prosecution history.

Id. (quoting Multiform Desiccants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1477 (Fed. Cir. 1998)). However, "[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges,

5

and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." Acumed LLC v. Stryker Corp., 483 F.3d 800, 805 (Fed. Cir. 2007) (quoting Phillips, 415 F.3d at 1314). Finally, when construing claim terms and phrases, the Court cannot add or subtract words from the claims or appeal to "abstract policy considerations" to broaden or narrow their scope. SmithKline Beecham Corp. v. Apotex Corp., 403 F.3d 1331, 1339-40 (Fed. Cir. 2005); see Quantum Corp. v. Rodime, PLC, 65 F.3d 1577, 1584 (Fed. Cir. 1995) ("[I]t is well settled that no matter how great the temptations of fairness or policy making, courts do not redraft claims.").

### B.  Types of Evidence to Be Considered

In determining the meaning of disputed terms or phrases, the Court should first examine the claim and the specification. The Federal Circuit has stated that "the claims themselves provide substantial guidance as to the meaning of particular claim terms," and "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." Phillips, 415 F.3d at 1314.

The claims, however, "do not stand alone" and "'must be read in view of the specification, of which they are a part.'" Id. at 1315 (quoting Markman v. Westview Instruments, Inc., 52

F.3d 967, 979 (Fed. Cir. 1995) (en banc)); see also Vitronics, 90 F.3d at 1582 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."); Multiform Dessicants, 133 F.3d at 1478 ("The best source for understanding a technical term is the specification from which it arose, informed, as needed, by the prosecution history."). The specification, as required by statute, describes the manner and process of making and using the patented invention, and "[t]hus claims must be construed so as to be consistent with the specification . . . ." Merck & Co. v. Teva Pharms. USA, Inc., 347 F.3d 1367, 1371 (Fed. Cir. 2003); see Markman, 517 U.S. at 389 (referencing the "standard construction rule that a term can be defined only in a way that comports with the instrument as a whole"); Phillips, 415 F.3d at 1316 ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess. In such cases, the inventor's lexicography governs.").

In addition to the claims and specification, the Court should consider the prosecution history, which consists of the complete record of the proceedings before the Patent and Trademark Office ("PTO"), including the prior art cited during the examination of the patent and any subsequent reexaminations.

*Phillips*, 415 F.3d at 1317.   The prosecution history "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be."   *Phillips*, 415 F.3d at 1317 (citing *Vitronics*, 90 F.3d at 1582-83); *see* *Chimie v. PPG Indus., Inc.*, 402 F.3d 1371, 1384 (Fed. Cir. 2005) (indicating that the purpose of consulting the prosecution history as part of claim construction is to exclude any disclaimed interpretation).   "At the same time, because prosecution history represents an ongoing negotiation between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less useful for claim construction purposes.'" *Trading Technologies Int'l, Inc. v. eSpeed, Inc.*, 595 F.3d 1340, 1352 (Fed. Cir. 2010) (quoting *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1401 (Fed. Cir. 2008)).

The Court may also examine extrinsic evidence, which includes "all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Markman*, 52 F.3d at 980.   For example, technical dictionaries may provide the Court with a better understanding of the underlying technology and the way in which one of skill in the art might use the claim terms.   *Phillips*,

415 F.3d at 1318; see also Vitronics, 90 F.3d at 1584 n.6.
Expert testimony also can be useful:

> to provide background on the technology at issue, to
> explain how an invention works, to ensure that the
> court's understanding of the technical aspects of the
> patent is consistent with that of a person of skill in
> the art, or to establish that a particular term in the
> patent or the prior art has a particular meaning in
> the pertinent field.

Phillips, 415 F.3d at 1318; see also Pitney Bowes, Inc. v.
Hewlett-Packard Co., 182 F.3d 1298, 1308-09 (Fed. Cir. 1999).
"However, while extrinsic evidence 'can shed useful light on the
relevant art,' [the Federal Circuit has] explained that it is
'less significant than the intrinsic record in determining "the
legally operative meaning of claim language."'" Phillips, 415
F.3d at 1317 (citing C.R. Bard, Inc. v. U.S. Surgical Corp., 388
F.3d 858, 862 (Fed. Cir. 2004) (quoting Vanderlande Indus.
Nederland BV v. Int'l Trade Comm'n, 366 F.3d 1311, 1318 (Fed.
Cir. 2004)).

Finally, with respect to general usage dictionaries, the
Federal Circuit has noted that "[d]ictionaries or comparable
sources are often useful to assist in understanding the commonly
understood meaning of words and have been used . . . in claim
construction," and that "[a] dictionary definition has the value
of being an unbiased source 'accessible to the public in advance
of litigation.'" Phillips, 415 F.3d at 1322 (quoting Vitronics,

90 F.3d at 1585).[1]  However, the Federal Circuit cautions that "'a general-usage dictionary cannot overcome art-specific evidence of the meaning' of a claim term," that "the use of the dictionary may extend patent protection beyond what should properly be afforded by the inventor's patent," and that "[t]here is no guarantee that a term is used in the same way in a treatise as it would be by the patentee." Phillips, 415 F.3d 1322 (quoting Vanderlande, 366 F.3d at 1321).  Additionally, "different dictionaries may contain somewhat different sets of definitions for the same words.  A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another." Id.

With the foregoing principles in mind, the Court will now examine the patents and the disputed claim terms.

---

[1] In Phillips, the Federal Circuit expressly discounted the approach taken in Texas Digital Systems, Inc. v. Telegenix, Inc., 308 F.3d 1193 (Fed. Cir. 2002), in which the court placed greater emphasis on dictionary definitions of claim terms. Phillips, 415 F.3d at 1319-24 ("Although the concern expressed by the court in Texas Digital was valid, the methodology it adopted placed too much reliance on extrinsic sources such as dictionaries, treatises, and encyclopedias and too little on intrinsic sources, in particular the specification and prosecution history."). The Phillips opinion reaffirmed the approach used in Vitronics, Markman, and Innova as the proper approach for claim construction, but acknowledged that there was "no magic formula," and that a district court is not "barred from considering any particular sources . . . as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence." Id. at 1324.

### III. ANALYSIS OF THE DISPUTED CLAIM TERMS

In advance of the Markman hearing, the parties submitted a joint claim construction chart that includes five agreed upon claim terms and eleven disputed claim terms. The Court adopts the parties' stipulated constructions of the agreed upon terms, and individually addresses each of the disputed claim terms herein.

Before reaching the construction of the eleven disputed terms, the Court resolves the parties' disagreement regarding the appropriate method to address disputed terms 1 through 4. Each of disputed terms 1 through 3 is a relatively short term that appears to encompass a distinct concept, whereas term 4 is a lengthy forty-two word term that is a conglomeration of disputed terms 1 through 3, among other language.[2]  iHance asks for the Court to construe term 3 and the multi-part term 4 and argues that proceeding in such manner would render it unnecessary to construe terms 1 and 2. In contrast, Eloqua seeks a construction of the component disputes broken out in disputed terms 1 through 3, and argues that proceeding in such manner would render it unnecessary to construe multi-part disputed term 4. The Court finds that Eloqua's proposed

---

[2] Disputed Term 4 reads as follows: "control logic configured to modify an outgoing email addressed to the email recipient and sent using an email client configured to allow a sender to send the outgoing email and access one or more personal or corporate emails belonging to the sender."

approach is preferable, both because separately analyzing each component term is clearer and more precise, and because the disputed component terms appear elsewhere in the patents' claims without the remainder of the language contained in disputed term 4. Claims Construction Chart, ECF No. 77 Ex.1. Accordingly, the Court does not construe disputed term 4, and instead addresses the component disputes set forth in disputed terms 1 through 3.

## 1. *"outgoing email"*[3]

### a. Proposed Constructions

**iHance:** No construction is proposed for disputed term 1. Additionally, no proposed construction of this term can be directly excised from iHance's written constructions of disputed terms 4 or 5, since both use the phrase "outgoing email[s]" within the proposed construction of "outgoing email." However, iHance's briefing and oral argument effectively set forth iHance's position that an email's status as "outgoing" should be analyzed from the user's perspective, i.e., that an email should be deemed outgoing *"once a user finishes composing the email and pushes 'send.'"* iHance <u>Markman</u> Response at 13, ECF No. 76.

**Eloqua:** *"Email that has been sent by the email client"*

### b. Discussion

It is apparent from the parties' proposed constructions of the first five disputed terms that the crux of the dispute as to these terms relates to the stage, in the process of sending an email, at which that email should be classified as "outgoing."

---

[3] The Court makes no distinction between the singular and plural forms of the disputed terms, and the constructions adopted herein apply to both. For example, the construction for the term "outgoing email" also applies to the term "outgoing emails."

According to the parties, such distinction is paramount in this case because the patent claims describe a system for modifying an "outgoing email" by inserting email tracking information into such email, and the permissible timing of such modification necessarily depends on when an email is deemed "outgoing." iHance contends that an email is "outgoing" after the sender finishes composing the email and pushes a send button (user's/sender's perspective), whereas Eloqua argues that an email is not "outgoing" until the email has actually been transmitted by the "email client"[4] (system perspective). Although, at first blush, the timing dispute appears more appropriately resolved in conjunction with construing disputed term 3, because Eloqua's proposed construction of term 1, and iHance's arguments regarding term 1, include a timing element that necessarily implicates when the system can permissibly modify/edit an email, the Court must squarely address the timing dispute in construing the first disputed term.

Beginning with the claim language, the Court notes that nothing in the claims appears to directly address what it means for an email to be "outgoing." The claims never mention a user pushing "a send button" nor do they state that an email is not "outgoing" until it has left the email client. However, careful

---

[4] The parties have stipulated to the construction of a multi-part term that includes the term "email client" and defines such term as follows: "A Mail User Agent that acts as a front-end program for email." Claims Construction Chart, ECF No. 77 Ex.1.

13

consideration of the relevant claim language appears to lend some support for focusing on the user's perspective. The fact that the claim language references emails being sent "using an email client," as opposed to emails being sent "by an email client" appears to offer some support for the user-centric focus espoused by iHance.[5]

In addition to providing some support for iHance's proposed construction, the claim language itself appears to foreclose adoption of the construction proposed by Eloqua, whose construction mandates that an email is not "outgoing" until it actually departs, i.e., is sent by, the "email client." Comparison of the language in Claims 1, 2, and 3 of the '947 patent demonstrates the flaw in Eloqua's proposal.[6] Claim 1 requires that an "outgoing email" be modified by the system to include a tracking code, but fails to expressly define what part of the system performs such modification. Dependent Claim 2 indicates that the "control logic"[7] configured to perform the modification of an outgoing email can be "embedded" on one of

---

[5] As discussed in the analysis of the second disputed term, iHance's position during reexamination nevertheless establishes that for an email to be sent "by" an individual "using an email client," the email must ultimately be "transmitted by" the email client.

[6] The comparison of Claims 1 through 3 of the '947 patent is merely exemplary. The operative language included in Claim 3 appears elsewhere in the '947 patent (e.g., Claim 14) and also appears multiple times in the '533 patent (e.g., Claim 8).

[7] The parties have stipulated to the following construction of "control logic": "Software, hardware, or a combination of software and hardware." Claims Construction Chart, ECF No. 77 Ex.1.

several servers, including "a mail server, a mail relay server, or a mail enhancement server." '947 Claim 2.   Dependent Claim 3 indicates that the "control logic" configured to perform the modification can be "embedded within the email client, a plug-in to the email client or an email client utility." '947 Claim 3 (emphasis added).   Such language from Claim 3, when read in conjunction with Claim 1, appears to claim the following: "control logic [embedded within the email client or a plug-in to the email client] configured to modify an outgoing email addressed to the email recipient and sent using an email client . . . ." '947 Claims 1, 3.

Eloqua's proposed construction of "outgoing email" seeks to import a limitation that does not appear in the claim terms, whereby an email would not be deemed "outgoing," and thus not eligible for modification, until after it departs the email client.   As discussed in greater detail below, Eloqua cites to the specification to support such proposed construction, noting that the specification describes a system where an email is first sent by the email client, and subsequently intercepted and modified by a mail enhancement server to include a tracking code or mechanism.   '947 4:19-25, 41-42.[8]   However, the plain language of the claims themselves expressly indicates that the "control

---

[8] The '947 and '533 patents share a specification, but are formatted differently.   For ease of reference, the Court will include citations only to the '947 specification.

logic" that modifies the emails to include a tracking mechanism can be embedded within the email client. Because "[e]ach claim of a patent has a purpose that is separate and distinct from the remaining claims," claims that are "narrower [in] scope can be useful to clarify the meaning of broader, independent claims under the doctrine of claim differentiation." In re Tanaka, 640 F.3d 1246, 1250-51 (Fed. Cir. 2011); see Cat Tech LLC v. TubeMaster, Inc., 528 F.3d 871, 885-86 (Fed. Cir. 2008) (rejecting a claim construction that would have rendered a claim limitation meaningless). Here, the fact that Claim 3 indicates that an "outgoing email" can be modified by control logic embedded within an email client suggests that it would be improper to interpret the phrase "outgoing email" in the broader independent Claim 1 to foreclose a system where the email is modified before it departs the email client. See Trading Technologies, 595 F.3d at 1352 (indicating that courts "must not import limitations into the claims from the specification.").

Based on the respect that must be afforded the claim language, even where a patent's specification repeatedly discusses a limitation, if such limitation is expressly included in some claims, but is not referenced in others, the district court should almost never import such limitation into a construction that applies to all claim terms. See DVSI v. University of Phoenix, 672 F.3d 1270 (Fed. Cir. 2012). Here,

16

Eloqua's proposal prohibiting modification of an email from occurring until after an email departs the email client appears in direct conflict with the claim language that expressly states that the patents at bar include a variation whereby the control logic that modifies the email is "embedded within" the email client.   See Liquid Dynamics Corp. v. Vaughan Co., Inc., 355 F.3d 1361, 1368 (Fed. Cir. 2004) ("Because the plain language of the claim was clear and uncontradicted by anything in the written description or the figures, . . . relying on the written description and prosecution history to reject the ordinary and customary meanings of the words themselves is impermissible."). As discussed below, neither the specification nor the prosecution history suggest that the use of the phrase "outgoing email" should be so narrowly interpreted such that an email is not deemed "outgoing" until after it "has been sent by" the email client.

The Court starts the analysis of the remainder of the intrinsic record with the proposition that claim construction is not an exercise aimed at limiting claims to the preferred or primary embodiment, but it instead seeks to define the entirety of what is covered by the patent. See Retractable Techs., Inc. v. Becton, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (indicating that courts should "strive to capture the scope of the actual invention, rather than strictly limit[ing] the scope of the

17

claims to disclosed embodiments . . . ."); Brookhill-Wilk 1, LLC v. Intuitive Surgical, Inc., 334 F.3d 1294, 1301 (Fed. Cir. 2003) ("Absent a clear disclaimer of particular subject matter, the fact that the inventor anticipated that the invention may be used in a particular manner does not limit the scope to that narrow context."). Turning to the specification, it is abundantly clear that the preferred embodiment of the patented inventions envision an email composed on, and sent using, an email client whereby the email is modified by the system to include a tracking code after the email has been transmitted from the email client to a separate "mail enhancement server." As highlighted by Eloqua, the specification states:

> The email is then sent by the email client **20** to its associated mail server **22**. Rather than sending the email directly to the recipient, the email client's mail server **22** routes the outgoing email to the system **10**, more specifically, the mail enhancement server **12**. In other words, the mail enhancement server **12** intercepts the outgoing email coming from the email client's mail server **22** . . . [and] edits the outgoing email to contain a tracking code or mechanism . . . .

'947 4:19-25, 41-42. However, such language is merely a description of an "exemplary embodiment" of the inventions, not a description of the lone manner in which the claimed systems operate. See Phillips, 415 F.3d at 1323 ("[A]lthough the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments."); Liebel-Flarsheim Co. v. Medrad,

Inc., 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope . . . .")."In other words, [in this embodiment], the mail enhancement server **12** intercepts the outgoing email coming from the email client's mail server **22** [and] edits the outgoing email to contain a tracking code or mechanism . . . ." Id.

Here, relevant to determining the scope of the actual inventions (versus the preferred embodiment) is the portion of the specification that directly addresses the timing of the modification of an "outgoing email." The specification states:

> It should be understood that the insertion of the tracking code and the image call into the email can be performed at any time prior to its delivery to the recipient. Furthermore, it should be noted that the functionality of the mail enhancement server **12** as described above can be implemented in a number of different ways. In alternative embodiments, the functionality of the mail enhancement server **12** including insertion of the tracking code and image call can be performed, for example, by the mail server **22** associated with the email client **20**, a mail relay server, the email client **20** itself, a plug-in to the email client **20** or an email client utility.

'947 6:7-19 (emphasis added). Based on this clear language, and the fact that the language in the claims themselves indicate that the "control logic" that modifies an "outgoing email" can be embedded within the "email client," it is improper to construe "outgoing email" in a manner that requires that an

email be sent/transmitted by the email client before it achieves "outgoing" status.

Although both the claim language and the specification support iHance's argument for a broad interpretation of the disputed claim term "outgoing email," the prosecution history, also part of the intrinsic record, places some limits on such otherwise broad term. See Phillips, 415 F.3d at 1317 (citing Vitronics, 90 F.3d at 1582–83) (indicating that the prosecution history "provides evidence of how the PTO and the inventor understood the patent" and "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be"). The Court agrees with Eloqua that iHance's statements during the recent reexamination of the '533 patent require the Court to adopt a construction that includes a limitation that is not apparent from the claims or specification. Cf. '947 6:9-10 (indicating that the tracking code can be inserted into an email "at any time" prior to delivery). However, as analyzed below, the Court disagrees with Eloqua as to the breadth of such limitation. See Home Diagnostics, Inc. v. LifeScan, Inc., 381 F.3d 1352, 1358 (Fed. Cir. 2004) ("Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is

entitled to the full scope of its claim language.") (emphasis added).

As part of the reexamination process, iHance was called upon to distinguish its claimed invention from several competing patents involving a similar subject matter (the "prior art"). In so doing, iHance, both in writing and at a hearing before the Board of Patent Appeals and Interferences ("BPAI"), took the position that unlike the prior art, iHance's patents involve interception and modification of an email to insert tracking information <u>after</u> the email is "dispatched with regard to the user." ECF No. 52 Ex.5 at A95. The following excerpts of oral statements made by iHance during reexamination support inclusion of some restriction on the term "outgoing email" regarding the timing as to when such email can be modified:

> The other aspect that is in the independent claims is that the control logic is configured to modify an outgoing e-mail. This is really where <u>the e-mail is dispatched by the user</u>, and <u>subsequent to this email being dispatched as an outgoing email</u>, it is intercepted and modified somewhere <u>subsequent</u> to the dispatching as an outgoing email.
>                               * * *
> [T]o try to distinguish what is not being claimed, . . . we're not claiming that the sending of an original e-mail <u>that is either authored or configured with an identifier or some type of tracking mechanism in it to begin with</u>. We're also distinguishing from this mail merge program, with the mail blast, that is specialized to just send.
>                               * * *
> The outgoing email in this context, which is clearly described in the specification, <u>as to where the e-mail is dispatched, with regard to the user, and it appears</u>

<u>to be gone, it's sent</u>, and <u>subsequent to that</u>, it is being intercepted and modified.

ECF No. 52 Ex.5 at A91, A92, A95 (emphasis added).

Having found that some limitation is necessary, the Court turns to considering the breadth of such limitation. At a minimum, the above statements demonstrate that iHance disclaimed a system where the email tracking code is inserted prior to an email being composed or prior to the email being sent <u>from the perspective of the user</u>. iHance could not be clearer in its disavowal of claim scope through the following statement: "[T]o try to distinguish <u>what is not being claimed</u>, . . . we're not claiming that the sending of an original e-mail <u>that is either authored or configured with an identifier or some type of tracking mechanism in it to begin with</u>." ECF No. 52 Ex.5 at A92 (emphasis added). Accordingly, the Court will adopt a construction of the disputed term that requires, at a minimum, that an email be dispatched from the user's perspective, i.e., it "appears to be gone," prior to it being modified for the purpose of tracking.

Eloqua argues for an interpretation of the prosecution history that would incorporate an even greater timing restriction. According to Eloqua, iHance's statements to the PTO demonstrate that, in all embodiments, an email can only be modified after it has been sent by, i.e. transferred from, the email client to a separate mail server. In support of such

contention, Eloqua cites to iHance's written submissions to the PTO where iHance indicates that an email is modified _after_ it has been transmitted by the email client.   See, _e.g._, ECF No. 52 Ex.3 at A56 ("[A] sent email has to be intercepted _after_ it has been 'sent' by the email client but before the email has been received by the recipient.").   Additionally, Eloqua highlights iHance's oral statements to the BPAI, including the statement that the patents at bar disclose an "e-mail client, as defined, sending/dispatching the message that is subsequently modified . . . ."  ECF No. 52 Ex.5 at A115 (emphasis added).

Notwithstanding the above statements to the PTO, the Court finds that iHance did not limit the scope of the term "outgoing email" in such a manner that requires in all embodiments that modification occur _after_ an email has left the email client. First, although iHance's written submission to the PTO stated that an email has to be intercepted and modified after it is "sent" by the email client, such statement is made in the context of describing "technical challenges" that must be overcome "in order to provide the claimed functionality transparently to the sender of an email."   ECF No. 52 Ex.3 at A56.   Such statement is not a clear disclaimer of claim scope because: (1) iHance made such statement to demonstrate that only its system utilizes an email client to send tracked emails, not to limit the breadth of the claims; and (2) providing the

claimed functionality "transparently" to the sender of an email appears to be a preferred embodiment, not a universal requirement, and thus, any limitation associated with such embodiment does not necessarily apply to all embodiments of the patent. Cf. '947 4:10-13 ("[I]n one exemplary embodiment, the system **10** is transparent to the user and functions seamlessly in cooperation with the email client **20** without altering the workflow of the user."). Second, although iHance orally stated to the BPAI that an email is modified after it leaves the email client, a careful examination of such statement reveals that iHance did not indicate that its invention universally includes such requirement, but rather, iHance indicated that the prior art did not operate in such manner. See ECF No. 52 Ex.5 at A115 ("Neither of these [prior patents] disclose the e-mail client, as defined, sending/dispatching the message that is subsequently modified in the way that's described in the claims."). Third, even if such statement sufficiently implies that iHance's patents necessarily include such limitation, the very next statement iHance made to the BPAI retreats from such requirement, as iHance stated: "In conclusion, . . . [none of the prior art] discloses . . . outgoing emails, <u>after they are dispatched with regard to the user</u> and transparent to the user, <u>that they are subsequently intercepted and modified</u>, in the manner recited in these claims." ECF No. 52 Ex.5 at A115. Such

concluding remark reiterates what iHance repeatedly stated during the BPAI hearing, that one distinguishing characteristic in iHance's patents is that they cover a system that modifies an email after it has been sent <u>from the perspective of the user</u>. Therefore, the only clear disavowal of claim scope that should be incorporated from the prosecution history is iHance's clear statement that it is not claiming that an email is composed with a tracking mechanism already inserted, but rather, such tracking mechanism is inserted after the email is sent from the perspective of the user. Although it is plain that a preferred embodiment of iHance's invention is configured to modify an outgoing email <u>after</u> it has been transmitted by the email client, the prosecution history fails to clearly indicate that such timing is a universal requirement.[9]

Consistent with the above interpretation, the context of the BPAI hearing suggests that the discussion was often not focused on the <u>precise</u> timing as to when an email can be modified. That is, subtle distinctions were not made regarding the difference between a user "dispatching" an email and the e-mail client transmitting the email. Accordingly, the context of

---

[9] At most, it can be said that iHance waivered back and forth at the hearing before the BPAI as to whether an email must only be dispatched by the user prior to modification, or whether the email must also be transmitted by the email client prior to modification. Such inconsistent statements, made orally in response to questioning, does not rise to the level of a "clear disavowal of claim scope." <u>Home Diagnostics, Inc.</u>, 381 F.3d at 1358.

the   discussion   supports   this   Court's   finding   that   iHance's statements   regarding   modification   of   an   email   after   it   is transmitted by the email client did not rise to the level of a clear disavowal of claim scope.   See Trading Technologies, 595 F.3d at 1352 (indicting that the prosecution history often lacks clarity   and   is   less   useful   than   the   specification   when conducting claim construction).

In  summary,  the  Court  finds  that  the  claim  language  and  the specification,   considered   in   isolation,   demonstrate   that   the claim   term   "outgoing   email"   does   not   include   any   inherent limitation  as  to  when  an  email  can  be  modified  to  include  a tracking code.   See '947 6:9-10 (indicating that a tracking code can be inserted into an email "at any time" prior to delivery). However,  iHance  clearly  disavowed  the  scope  of  such  language during  the  '533  reexamination  when  it  expressly  stated  that "what is not being claimed . . . [is] the sending of an original e-mail that is either authored or configured with an identifier or some type of tracking mechanism in it to begin with.   ECF No. 52  Ex.5  at  A92.   Although  iHance  did,  in  writing  and  orally, make  statements  indicating  that  some  embodiments  of  its  system do  not  modify  an  email  until  after  it  is  transmitted  by  the email  client,  such  statements  are  insufficient  to  demonstrate  a clear  disavowal  of  claim  scope  that  applies  to  all  embodiments, particularly  when  the  verbal  exchange  between  iHance  and  the

BPAI failed to even address the claim language that expressly permits the control logic that modifies an email to be "embedded within" the email client.  Accordingly, the Court adopts a construction consistent with the claims and specification, as partially limited by the clear disavowal made by iHance during reexamination.

    c. <u>Construction</u>

> **"a composed email that has been dispatched by the user, meaning that from the user's perspective, the email appears to be sent"**

**2. *"outgoing email sent using an email client"***

    a. <u>Proposed Constructions</u>

**iHance:** iHance does not propose a construction of this term, but the following was excised from iHance's construction for conglomerate term 4: "*'sent using an email client' requires that the control logic be configured to modify an outgoing email addressed to the email recipient that originates from an email client, e.g., because the sender pushed a send button*"
**Eloqua:** "*The outgoing email has been sent by the email client itself*"

    b. <u>Discussion</u>

The construction of the second disputed term is closely related to the first term, and the Court will incorporate the previously adopted construction of "outgoing email" into the construction of this term.  iHance's proposed construction of "sent using an email client" indicates that such requirement is met as long as a user presses a send button in an email client. In contrast, Eloqua argues that such term should be interpreted

to require that an email be <u>sent by</u> the email client itself.
The parties have stipulated to the definition of a longer claim
term that encompasses the definition of "an email client,"[10] so
the true dispute as to the instant term is the construction of
the phrase "sent using." Although the distinction between the
parties' proposals may appear subtle, the Court finds that
Eloqua's proposal is closer to the proper construction, as
illustrated by iHance's position during reexamination.

Beginning with the claim language, such language considered
alone does not appear to support Eloqua's proposed construction
because the disputed claim language states that an email is
"sent <u>using</u> an email client" as contrasted with "sent <u>by</u> an
email client." <u>See</u> <u>Chef America, Inc. v. Lamb-Weston, Inc.</u>, 358
F.3d 1371, 1374 (Fed. Cir. 2004) (indicating that the Federal
Circuit has "repeatedly and consistently . . . recognized that
courts may not redraft claims"). As discussed during the
analysis of the previous term, when determining the meaning of
"outgoing," the claims, as informed by the rest of the intrinsic
record, appear to support a user-centric approach whereby an
email is considered "outgoing" after it is has been dispatched

---

[10] The full claim term for which there is a stipulation is: "<u>An email</u>
<u>client</u> configured to allow a sender to send the outgoing email and
access one or more personal or corporate emails belonging to the
sender." Claims Construction Chart, ECF No. 77 Ex.1 (emphasis added).
The agreed upon construction for such term is: "<u>A Mail User Agent that</u>
<u>acts as a front-end program for email</u> and is configured to allow a
sender to send the outgoing email and access one or more personal or
corporate emails belonging to the sender." <u>Id.</u> (emphasis added).

by the user, i.e., "it appears to be gone." ECF No. 52 Ex.5 at
A95. Accordingly, at first blush, it does not appear
appropriate to adopt a construction of the instant term that may
transform the requirement that a user sends an email through
utilizing an email client into a requirement that an email is
sent by the email client itself. Stated differently, it appears
from the claim language that an email is sent by a user, not by
an email client, but that the user must utilize an email client
to send an email.

Although the statement immediately above squares with the
claim language, Eloqua has persuasively demonstrated that
consideration of the entire intrinsic record mandates a
modification to such interpretation. See Phillips, 415 F.3d at
1317 (citing Vitronics, 90 F.3d at 1582-83) (indicating that
prosecution history may demonstrate: (1) "how the inventor
understood the invention" and (2) "whether the inventor limited
the invention in the course of prosecution, making the claim
scope narrower than it would otherwise be."); Chimie, 402 F.3d
at 1384 (stating that the purpose of consulting the prosecution
history as part of claim construction is to exclude any
disclaimed interpretation). During the hearing before the BPAI,
part of the reexamination of the '533 patent, iHance expressly
distinguished its invention from the prior art based on the fact
that iHance's invention utilizes a typical email client to

transmit an email, whereas some of the prior art utilized a document preparation program/application that merely _interacted_ _with_ an email client.  ECF No. 52 Ex.5 at A99.  iHance explained that the relevant prior art first involved a document being composed in a document preparation program.  _Id._  When such document was ready to be emailed, the user would select email addresses, which could be provided by various sources, including from the address book associated with a typical email client such as Microsoft Mail.  _Id._  In the next step, "[b]oth the document and the addresses are uploaded to [a] server through a communication, and the server itself then sends an e-mail" to the recipient with a link to retrieve the document.  _Id._  iHance highlighted that, in such system, Microsoft Mail is only being used "to select the addresses"  _Id._

As a result, iHance explained that there are two key distinctions between such prior art and iHance's invention: (1) the prior art document preparation program "is not an e-mail client as defined in [iHance's] claims"; and (2) the "upload of a document and upload of addresses" is a type of communication, but is "not an e-mail"; rather, the email that is actually sent to the recipient "_is not configured until it is at the server._" _Id._ at A100 (emphasis added).  Stated differently, an email client is not utilized to send an email in the prior art—a document from one program is uploaded to a server, and an email

address from another program is uploaded to the server, and <u>the server</u>, not <u>the email client</u>, both configures and sends the email.

iHance continued fielding questions from the BPAI on such topic, and continued to clarify the scope of its invention. The following exchange occurred:

> <u>Judge</u>:   How would you respond if I said . . . [the prior art involved a user] sending the document that causes this e-mail to be sent, so in effect, the user is sending the e-mail.  By sending the document, they know there is going to be an e-mail sent.  By a third party, perhaps.

> <u>iHance</u>:   It's not sending the e-mail.   Uploading a document, uploading information, subsequently down the chain of events, yes, an e-mail is sent, <u>but it's not being sent by the e-mail client, the sender</u>.   It's being sent by the server.

> <u>Judge</u>:   I guess the question is if it's configured to allow a sender to send the outgoing e-mail, my question would be isn't the e-mail by sending the document allowing the sender to send this outgoing e-mail, although it's not coming directly from the sender?   Isn't it allowing an outgoing e-mail to be produced?

> <u>iHance</u>:   It might start a chain of events to where an e-mail is sent, where the claim specifically says it's an e-mail that's being sent and then modified.
> The other aspect, <u>not only is this e-mail not being sent from the e-mail client</u>, but the e-mail that is sent, after it is dispatched as an outgoing email, it is not subsequently intercepted and modified.
> There are two clear distinctions here where [the prior art] does not anticipate, at least two, does not anticipate these claims.   <u>These features are in each of the independent claims</u>.

<u>Id.</u> at A100-A101 (emphasis added).   iHance concluded its presentation on such topic to the BPAI by noting that none of

the references in the prior art "discloses the e-mail client,
that these messages are sent by the e-mail client as defined in
these particular claims, in each of these claims . . . ."   Id.
at 115 (emphasis added).

The BPAI relied on such statements in its subsequent order,
stating:

> We agree with Ihance that in the context of the '533
> patent, it would be unreasonable to regard as having
> used an email client to send an email when the email
> is actually composed and sent by another device.   The
> email client's just providing address book information
> is not enough.   Given the intrinsic nature of email
> clients in composing and sending email and the way
> email clients are described in the '533 patent, using
> an email client to send an email means the email
> client itself has to send the email.   Simply
> containing information accessed by another component
> which composes and sends an email cannot reasonably be
> regarded as sending the email.

ECF No. 52 Ex.6 at A126.

Although this Court is not bound by the BPAI's reasoning,
the BPAI's opinion reveals that the BPAI interpreted iHance's
remarks consistently with the manner in which this Court
interprets them.   iHance clearly took the position during the
reexamination that, unlike the prior art, its invention
necessarily involves an email that is composed on, and sent by,
an email client.   iHance's statements demonstrate that
"uploading a document" or "uploading information" to a different
server that ultimately generates and sends an email is not what

is being claimed by iHance; iHance's invention involves generating and sending an email utilizing an email client.

Nothing in the specification conflicts with the interpretation of the patents as requiring an email to be sent by an email client. Unlike the prosecution history, the specification does not clearly limit the meaning of this term. However, the specification does provide an "exemplary manner" of how the claimed system operates, and that begins with the following step: "A user or sender composes an email to a recipient using an email client 20." '947 3:56-57 (emphasis added). The specification later indicates that the "email client 20 can be application- or web-based and includes any device that can be used by the user or sender to send and receive his/her personal and/or corporate email correspondence." '947 4:2-5 (emphasis added). In such exemplary system, after the sender composes the email using an email client, "[t]he email is then sent by the email client 20 to its associated mail server." '947 4:18-19 (emphasis added). Although the Court recognizes that the above statements merely discuss a preferred embodiment, neither the statements above nor any other statements in the specification evince an intent to describe an invention involving an email that is not ultimately transmitted by the email client.

33

Although the Court's construction of the instant term is based primarily on the intrinsic record discussed above, the Court also considers the definition of the word "send" from an extrinsic source provided by Eloqua—a technical dictionary. Such technical dictionary defines "send" as: "To transmit a message or file through a communications channel."  Microsoft Computer Dictionary (4th ed. 1999), ECF No. 52 Ex.13.

iHance's proposed construction, that an email is "sent using an email client" as long as the user presses a send button in an email client, is not adopted by the Court as it might be misinterpreted to cover a system that does not actually involve an email being composed/configured on, and transmitted by, an email client.  For example, a plug in to an email client could install a button labeled "send addresses," and activating such button in the email client could export email addresses to a separate server that ultimately composes and sends an email. iHance's statements during reexamination expressly disclaimed a similar system because the separate "upload of a document" and "upload of addresses" to a server is "not an e-mail," and therefore, such a system does not involve an email "<u>being sent by the e-mail client, the sender</u>.  It's being sent by the server."  ECF No. 52 Ex.5 at A100.  The construction adopted by the Court must not permit iHance to recapture scope expressly disclaimed during reexamination.  <u>Southwall Technologies, Inc.</u>

v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers.").

The Court acknowledges that the claim language itself suggests that a user, not an email client, "sends" an email. Cf. ECF No. 52 Ex.5 A103 (iHance fielding a question as to whether an email client, or an individual "sends" a message, and stating that "the sender sends it through using the email client"). However, iHance repeatedly blurred the line between a user "sending" an email and an email client "sending" an email during the reexamination process. In fact, in iHance's Markman brief, which argues in detail that an email is sent by a user, not an email client, iHance indicates that after a user "sends" an email, "the email client can then transmit the email to a mail server." iHance Markman Brief, ECF No. 55 at 10 (emphasis added). Thus, even in advancing such argument before this Court, iHance appears to recognize that its claimed system ultimately involves an email client "transmitting" the email. Accordingly, some apparently conflicting statements before the BPAI, and before the Court, may merely be a matter of semantics. However, when such statements are considered in their totality, the fact that a user "sends" an email, and that the sending of an email should be considered from the user's perspective, does not appear to conflict with the fact that iHance has clearly

taken the position that an email sent "using an email client,"
ultimately requires such email to be transmitted by the email
client.    Therefore, in light of the totality of the intrinsic
record, the technical definition provided by Eloqua, and the
arguments advanced by the parties, the Court finds it
appropriate to construe the instant claim term as requiring that
an email actually be transmitted by an email client, even if
such transmission may, in some embodiments, occur after an email
is "sent" from the perspective of the user.

    Although the Court's construction does not adopt Eloqua's
proposal without change, the concept captured by Eloqua's
construction is relied on heavily by the Court in crafting a
construction of this term.   The Court's construction, grounded
in the analysis above, also incorporates the parties'
stipulation as to the meaning of "email client," and the
construction of the first disputed term.

c. Construction

**"a composed email that has been dispatched by the user,
meaning that from the user's perspective, the email appears
to be sent; such email has been/will be transmitted by a
Mail Server Agent that acts as a front end program for
email."**

3. *"modify an outgoing email" / "edit the outgoing email"*

a. Proposed Constructions

**iHance:**    *"make a change to an outgoing email"*

**Eloqua**: *"The outgoing email is intercepted and altered after it has been sent by the email client"*

b. Discussion

Similar to the first disputed term, Eloqua's proposed construction for this term focuses on the timing of an email acquiring status as "outgoing," rather than on the claim terms "modify" or "edit." The proposed constructions of claim terms "modify" and "edit" that are advanced by iHance ("make a change to") and Eloqua ("alter[]") are merely synonyms that fail to offer any additional clarity. Such lack of additional clarity is highlighted by the fact that there are two discrete disputed claim terms ("modify" and "edit") yet both parties propose a single construction that fails to differentiate between such distinct claim terms. Furthermore, neither iHance nor Eloqua has demonstrated in their briefs or at oral argument any reason that "make a change to" or "alter" are more appropriate than the words "modify" or "edit" based on "the customary understanding of a person of ordinary skill in the art who reads them in the context of the intrinsic record." Agilent Techs., Inc. v. Affymetrix, Inc., 567 F.3d 1366, 1376 (Fed. Cir. 2009).

Accordingly, the Court concludes that no construction is necessary regarding the words "modify" or "edit" as there simply does not appear to be a true legal dispute among the parties as to such words and the proposed constructions fail to add any clarity to the claim terms. To the contrary, the fact that the

parties seek a single construction to jointly define the words "modify" and "edit" suggests that the parties do not view such claim terms as conferring a specific meaning unique to the patent. See U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of the infringement. It is not an obligatory exercise in redundancy."); Acumed LLC, 483 F.3d at 805 (quoting Phillips, 415 F.3d at 1314) ("The task of comprehending [claim] words is not always a difficult one [and] "'[i]n some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent . . . and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words.'"). As to what appears to be the true legal dispute surrounding this term—the timing and location in the system where an email is modified to include tracking code—such dispute has already been addressed and resolved above. The Court therefore declines to adopt a construction of disputed term 3.

c. Construction

**No construction adopted based on prior rulings and the lack of a legal dispute regarding the words "modify" or "edit."**

**4.** **"control logic configured to modify an outgoing email addressed to the email recipient and sent using an email client configured to allow a sender to send the outgoing email and access one or more personal or corporate emails belonging to the sender"**

a. Proposed Constructions

**iHance:** "'control logic configured to modify an outgoing email addressed to the email recipient (e.g., recipient@ recipient.com) and sent using an email client configured to allow a sender to send the outgoing email and access one or more personal or corporate email belonging to the sender (e.g., have an inbox).' In this limitation, 'sent using an email client' requires that the control logic be configured to modify an outgoing email addressed to the email recipient that originates from an email client, e.g., because the sender pushed a send button."

**Eloqua:** No construction necessary based on the construction of disputed terms 1 through 3 and stipulations.

b. Discussion

The Court previously adopted Eloqua's proposed approach of construing disputed terms 1 through 3, which are subparts of this lengthy term, rather than attempting to construe this multi-part term that exceeds forty words. iHance fails to demonstrate the existence of any remaining disputes over the construction of any subparts of this term that are not adequately addressed either by the above constructions or by the parties' stipulations. Accordingly, no construction is adopted.

c. Construction

**No construction adopted based on prior rulings and stipulations addressing and resolving all disputes associated with this term.**

5. **"a plurality of email clients configured for use by a plurality of corresponding senders to send a plurality of outgoing emails and access a plurality of incoming personal or corporate emails"**

    a. Proposed Construction

> **iHance:** "'more than one email client, each for use by its corresponding sender, configured to send more than one outgoing email and access more than one incoming personal or corporate emails (e.g., have an inbox).' In this limitation, 'email clients configured . . . to send a plurality of outgoing emails' requires that the email clients be configured so that outgoing emails originate from the email clients, e.g., because the senders pushed a send button."

> **Eloqua:** No construction necessary based on construction of disputed terms 1 through 3 and stipulations.

    b. Discussion

The above term is in essence the second half of disputed term 4 in its plural form. As the Court has already concluded that construction of terms 1 through 3 resolves the disputes regarding this same language in singular form, the Court likewise finds that such previous constructions resolve all disputes regarding the instant term. See Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1334 (Fed. Cir. 2003) ("[W]e presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning."). Additionally, the Court notes that the parties have stipulated to the construction of this exact term, and have agreed that the claim term "plurality" means "two or more." Claims Construction Chart, ECF No. 77 Ex.1. Although the

parties' stipulation leaves unsettled what it means "to send . . . outgoing emails," the Court resolved such reserved issue above. Accordingly, the Court declines to adopt a construction of this term.

### c. Construction

**No construction adopted based on prior rulings and stipulations addressing and resolving all disputes associated with this term.**

### 6. "an Internet domain related to the sender or a business entity associated with the sender"

#### a. Proposed Construction

**iHance:** *"the Internet domain of the sender (e.g., sender.com) or the Internet domain of a business entity that does business with the sender (e.g., softwarecompany.com)"*

**Eloqua:** *"An Internet domain of the sender's email account or owned by the sender's company or corporation. For example, if the sender's email account is a personal one, such as john@yahoo.com, then the related Internet domain is yahoo.com. If the sender's email account is a business one, such as john@CompanyX.com, CompanyX.com is a related Internet domain."*

#### b. Discussion

As acknowledged by Eloqua's counsel at oral argument, the Court faces a "particular challenge" in construing the instant disputed term as "there isn't a lot to go on." Markman Tr. 85, ECF No. 86. The patents do not squarely address the breadth of the phrase "associated with," and the parties therefore offer limited references to the intrinsic record in support of their respective proposals. As discussed below, the Court finds that

41

neither the intrinsic nor extrinsic evidence supports a narrow interpretation of the word "associated" that would support the construction proposed by Eloqua. Accordingly, the Court adopts the broader construction proposed by iHance which is supported by the plain and ordinary meaning of the phrases "related to" and "associated with."

Beginning with the claim language itself, nothing in the claims suggest that the phrases "related to" or "associated with" are used in a manner that would somehow specially restrict the reach of such expansive words. See Merck & Co. v. Teva Pharmaceuticals USA, Inc., 395 F.3d 1364, 1370 (Fed. Cir. 2005) (quoting Elekta Instrument S.A. v. O.U.R. Sci. Int'l, Inc., 214 F.3d 1302, 1307 (Fed. Cir. 2000)) ("'Absent an express intent to impart a novel meaning, claim terms take on their ordinary meaning.'"). The patentee could easily have included an express restriction in the claims that required that monitoring occur within a domain owned or operated by the sender or the sender's corporation. The patentee did not, instead requiring only that the domain be "related to" the sender or a business entity "associated with" the sender. The claim terms therefore appear to support iHance's expansive interpretation of such disputed term rather than Eloqua's restrictive interpretation.

Consideration of the specification similarly suggests that Eloqua's proposed construction is overly restrictive. Eloqua

fails to highlight any language in the specification that suggests that "an Internet domain related to . . . a business entity associated with the sender," '947 Claim 1 (emphasis added), is necessarily limited to a domain owned by the sender's company or corporation.    Furthermore, nothing in the specification suggests that the patentee "act[ed] as his own lexicographer in redefining the meaning of particular claim terms away from their ordinary meaning." Merck & Co., 395 F.3d at 1370.

In support of its proposed construction, Eloqua does cite to a portion of the specification discussing an "email account [that] is associated with a single domain which in a business context is typically owned by the sender's company or corporation."   '947 3:59-61 (emphasis added).   However, such excerpt fails to support Eloqua's proposed construction for several reasons.   First, the quoted language comes from the portion of the specification discussing an "exemplary embodiment" of the patent and nothing therein suggests that such statement, no matter how it is interpreted, is intended to restrict all embodiments of the patent. See Retractable Techs., 653 F.3d at 1305 (indicating that a Markman construction should "capture the scope of the actual invention, rather than strictly limit[ing] the scope of the claims to disclosed embodiments . . ."). Second, such excerpt discusses an email account being

43

"associated with" a specific domain, as contrasted with the permissible internet domain within which monitoring of emails is performed—the crux of the instant dispute. Third, even when using the word "associated" within a discussion of a slightly different concept, nothing therein suggests an effort to import any limitation into such expansive word. Fourth and finally, the specification's reference to "ownership" of a domain expressly recognizes that a domain associated with an email account is "typically", and thus not always, owned by the sender's company. Such express acknowledgement that ownership is not required is by itself a strong indication that Eloqua's proposed construction is overly narrow.

Eloqua's subsequent citation to the specification's discussion of a "cross-promotional or partnering arrangement" also fails to support Eloqua's proposed construction as such language does not address the permissible domain that may perform the monitoring of email or website behavior. '947 13:10-37. Rather, such specification excerpt may actually undercut Eloqua's position because it discusses at length a cross-promotional arrangement between two companies, but it does not address (or in any way limit) which company's domain must perform the monitoring.[11] Accordingly, nothing in such

---

[11] The specification discusses an embodiment involving a partnership between Company X (sender of the email/company advertising its website) and Company Y (partner company that is also advertising its

44

discussion suggests an attempt to limit, restrict, or act as a lexicographer, for the broad term "an Internet domain related to . . . a business entity associated with the sender." '947 Claim 1 (emphasis added).

An examination of the specification reveals no conflict with iHance's proposed construction of this term, which relies on the ordinary expansive meaning of the phrase "associated with." See Ring Plus, Inc. v. Cingular Wireless Corp., 614 F.3d 1354, 1364-65 (Fed. Cir. 2010) (affirming the district court's broad construction of the claim term "sound presentation" and noting that the plaintiff failed to identify any support in the specification for limiting such "ordinary term with a plain meaning"). As previously discussed, dictionaries and treatises are "among the many tools that can assist the court in determining the meaning of particular terminology to those of skill in the art of the invention." Phillips, 415 F.3d at 1318. Such tools are particularly useful when neither the claims nor the specification squarely address the scope of a claim term.

---

separate website). '947 13:10-36. Although such "cross-promotional or partnering arrangement," envisions both companies' websites being advertised through hyperlinks in a single email sent by Company X, nothing in such example suggests that monitoring must only be performed within the domain owned by the sender of the email. Stated differently, nothing in the specification suggests that it would be impermissible for Company Y, who did not send the email, to monitor the activity on its own website within its own domain. Elsewhere, the specification discusses tracking codes being "used to monitor outgoing emails originat[ing] from individuals respectively associated with a group of related business entities," '947 4:50-52, yet once again, the specification does not limit the domain within which monitoring is performed.

The definitions of "associated" provided by Oxford Dictionary, as set forth at OxfordDictionaries.com, include: "(of a person or thing) connected with something else." Similarly, the definitions of "associate" provided by Merriam-Webster Dictionary, as set forth at Merriam-Webster.com, include: "to come or be together as partners, friends, or companions." None of the submissions before the Court demonstrate that "associated" generally has a different meaning to those skilled in the relevant art. See Phillips, 415 F.3d at 1321 ("Properly viewed, the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent.").

The Court declines to wade into the complexities of the email tracking systems/methods actually implemented by iHance or Eloqua, and instead retains its focus on the claims, the other intrinsic evidence, and the relevant extrinsic evidence. In considering the intrinsic record, the Court agrees with counsel for Eloqua that "there isn't a lot to go on." Markman Tr. 85. Accordingly, it is understandable why counsel for Eloqua argued for a construction based in part on "the concept that Eloqua thinks the patent clearly presents." Id. at 88. However, no rule of construction limits the patentee to embodiments expressly presented in the specification. Rather, the Court is called upon to determine whether the intrinsic and extrinsic evidence support the interpretation of the claim language as

having a specific legal meaning.   Here, the claims themselves use expansive terms and nothing in the specification, or elsewhere in the intrinsic record, operates to limit the breadth of such terms.   The extrinsic record similarly supports only a broad meaning for such terms.   Accordingly, the Court will interpret such terms to have their plain and ordinary meaning. The Court therefore adopts iHance's proposed construction.

c. Construction

**"the Internet domain of the sender (e.g., sender.com) or the Internet domain of a business entity that does business with the sender (e.g., softwarecompany.com)"**

**7. "upon receipt of the [associated]**[12] **tracking code by the remote server, the remote server is able to determine whether the [corresponding] modified outgoing email has been opened by the email recipient"**

a. Proposed Constructions

**iHance:** *"upon receipt of the [associated] tracking code by the remote server, the remote server has received information that can be used to determine whether the [corresponding] modified outgoing email been opened by the email recipient"*

**Eloqua:** *"The remote server uses a received tracking code to individually determine whether a specific recipient has opened the modified outgoing email"*

---

[12] The brackets used in this term, and the construction adopted by the Court, are intended to demonstrate that the claim dispute, and the resolution of such dispute, implicates both the claim language that includes the bracketed terms, and the claim language that does not include such terms.

b. Discussion

The competing constructions before the Court focus on different portions of this multi-part disputed term. iHance focuses its proposal on the phrase "able to determine" whereas Eloqua focuses on the phrase "has been opened by the email recipient." Similar to the prior term, Eloqua acknowledged at the Markman hearing that the intrinsic record does not provide much guidance as to the proper construction of this term. As discussed below, because neither party has sufficiently supported their proposals, the Court declines to adopt either proposed construction, although the Court draws from such proposals in adopting a construction. See Sunbeam Products, Inc. v. Hamilton Beach Brands, Inc., No. 3:09cv791, 2010 WL 3291830, at *5 (E.D. Va. Aug. 19, 2010) (declining to adopt either party's proposed constructions because doing so "would be to effectively rewrite the patent, which is not within the Court's province in claim construction").

Considering, first, iHance's proposed construction, iHance's proposal focuses on the claim language "the remote server is able to determine whether" an email was opened. Curiously, iHance argues that what appears to be a straightforward requirement—that the identified server be "able to determine" something—does not require that such server actually be "able" or "capable" of determining that same thing.

iHance contends that the disputed claim language should be interpreted as the remote server "receiv[ing] information that can be used to determine" whether such email has been opened. Such strained construction, however, would permit a remote server to be "<u>unable</u> to determine" whether an email has been opened as long as another, unmentioned and undisclosed, part of the system is capable of making such determination.   Such a construction simply cannot be squared with the express language chosen by the patentee to define the scope of the claimed invention.   See <u>Phillips</u>, 415 F.3d at 1314 ("[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms"); <u>CytoLogix Corp. v. Ventana Medical Systems, Inc.</u>, 424 F.3d 1168, 1173 (Fed. Cir. 2005) (rejecting the district court's construction as erroneous as it "conflicts with the plain language of the claims").[13]

In examining the claims themselves, the Court also considers the context in which the disputed claim language is used.   See <u>Phillips</u>, 415 F.3d at 1314 ("[T]he context in which a term is used in the asserted claim can be highly instructive."). Here, several independent claims in the '947 patent discuss various systems for tracking emails, but the <u>final clause</u> in

---

[13] As discussed below, Eloqua's proposed construction and argument does not focus on a server being "able to determine" that an email has been opened, although Eloqua's proposal of this disputed term includes language that would require the remote server "to . . . determine" whether an email has been opened.

each such claim indicates that upon receipt of the tracking code "the remote server is able to determine whether the modified outgoing email has been opened by the email recipient." '947 Claims 1, 9, 12, 20.[14]  None of these claims, which all describe a system for monitoring email behavior, mention any other part of the system being able to determine whether an email has been opened.  Similarly, although various dependent claims follow such independent claims, none of the dependent claims describe nor infer that any other part of the claimed system is capable of determining that an email has been opened.  The only conclusion that can be reached from the context of such claim language and structure is that each time the patent asserts that the remote server is "able to" determine that an email is opened, such server must actually be capable of making such determination.  Based on the above, the Court finds that nothing in the claims suggests that "able" has a different meaning in this patent, or in the art, than the generally understood meaning of "capable."  See OxfordDictionaries.com ("having the power, skill, means, or opportunity to do something"); Merriam-Webster.com ("having sufficient power, skill, or resources to accomplish an object").

---

[14] The requirement that the remote server be "able to determine" that an email has been opened does not appear in every independent claim of the '947 patent, and it does not appear in any claim in the '533 patent.

Consideration of the specification likewise does not provide support for iHance's proposed construction. The specification does, at one point, reference a logging server collecting relevant data/information associated with the opening of an email and forwarding it to a database, the database then "generates and sends a real-time alert to the sender alerting the sender of pertinent recipient activities." '947 11:39-46. Such statement, however, never indicates that it is the database that is "able to determine" that the email has been opened. Rather, such example merely states that the database generates an alert which is routed to the sender. Furthermore, nothing in such discussion suggests that the remote server is not able to determine that an email has been opened.[15] Accordingly, iHance's citations to the specification are insufficient to redefine the phrase "is able" in a manner that could include "not able."

The Court also considers, and rejects, iHance's contention that Figure 1, which appears in both patents, establishes that the "remote server" referenced in '947 Claims 1, 9, 12, 20, does not need to be capable of determining that an email has been opened. First, nothing in Figure 1 establishes that the

---

[15] The disputed claim language follows the word "comprising," which is a "term of art used in claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim." Genentech, Inc. v. Chiron Corp., 112 F.3d 495, 501 (Fed. Cir. 1997). Although such interpretation suggests that the addition of a database is permissible, a remote server capable of determining that an email has been opened remains essential based on the claim language chosen by the patentee.

database displayed therein is responsible for determining that an email is opened.  Second, even if the Court assumed that the database could make such determination, nothing would suggest that it is permissible for the remote server _not_ to possess such capability.  Finally, the claims at issue do not even mention a database.  In fact, the only place that a database is described as performing such function is in iHance's Powerpoint slides to its Markman presentation.  Although iHance argues that one or more logging servers working in conjunction with a database can make the determination that an email is opened, such argument is predicated on a real world implementation of an email tracking system as opposed to the claim language, as informed by the specification and other relevant evidence.  The Court declines to engage in line-drawing regarding infringement analysis of real world products.  See PPG Industries v. Guardian Industries Corp., 156 F.3d 1351, 1355 (Fed. Cir. 1998) (indicating that all ambiguity need not be resolved by the Court in an effort to "facilitate a comparison between the claim and the accused product"; rather, after a claim is defined "with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact").  Therefore, maintaining the claims construction focus on the words "able to"

as used in the claims, and as informed by the specification, the Court finds that the words "able to" must be interpreted to mean "capable of."[16]

The Court's conclusion is bolstered by the fact that the specification expressly discusses a logging server "examining the associated image call (which contains the associated tracking code), the logging server **14** is then able to determine that the email has been opened."   '947  7:23-25.[17]   The specification does not say that the logging server receives information that a separate disclosed, or undisclosed, part of the system may later use to determine that an email has been opened.

Accordingly, after reviewing the claims and intrinsic record in detail, the Court concludes that iHance is, in essence, seeking to redraft this disputed claim term to expand its scope beyond the ordinary and well-accepted meaning of the

---

[16] The Court rejects iHance's contention that a catch-all reference in the specification to the system being implemented in an "integrated or non-integrated manner" is sufficient to trump the clear claim language requiring that the "remote server" be "able" to accomplish a specified task.   '947 12:11-14.

[17] Neither party directly asks the Court to define "remote server" as both proposed constructions simply repeat such phrase. iHance has indicated in a brief that "the logging server" in Figure 1 "corresponds to the 'remote server' in the claims."   iHance Supp. Brief at 4, ECF No. 120.  Although the Court does not endeavor to sua sponte construe "remote server," consistent with the analysis of disputed terms 10 and 11, the claims' references to "a" remote server, appears to indicate that the claimed system can include one or more remote servers.

phrase "able to."   See Chef America, 358 F.3d at 1374
(indicating that courts "may not redraft claims, whether to make
them operable or to sustain their validity").   iHance's support
for its proposed construction is not persuasive, and the Court
therefore rejects iHance's construction with respect to the
first part of this disputed term.   The Court finds that the most
appropriate manner to resolve the instant dispute, and avoid
unintentionally expanding, or limiting, the meaning of the claim
terms, is simply to replace "able to" with "capable of."

     The Court next addresses Eloqua's proposed construction of
the disputed term.   As indicated by Eloqua's counsel at the
Markman hearing, "Eloqua's proposed construction goes at a
different issue [than iHance's construction], and it principally
goes to the issue whether the system is able to determine
whether a specific recipient has opened the modified outgoing
email."   Markman Tr. 89 (emphasis added).   Eloqua's proposal is
based primarily on the statements iHance made to the PTO during
reexamination and the statements in the specification discussing
the difficulty that necessarily arises when tracking multiple
emails that are sent to the same recipient domain.   The Court
finds that Eloqua has not demonstrated the propriety of
importing the proposed limitation into the claim terms.

     The intrinsic record, including the specification and
materials associated with the PTO reexamination, is replete with

examples of iHance describing the difficulty of tracking an email sent to multiple recipients on the same recipient domain. See, e.g., '947 2:4-29; PTO Filing, ECF No.52 Ex.3 at 21.   Such difficultly arises from the conventional way of processing an email with multiple recipients with the same email domain (such as recipient.com).   If an email is sent to ten recipients that have "recipient.com" email addresses, only a single copy of the email is transferred from the sender's mail server to the recipient.com mail server and then the recipeint.com server copies the email ten times and routes one copy to each recipient.   The problem with sending "tracked" emails that are processed by this traditional method is that only one modified outgoing email with a single tracking code would be routed to the recipient.com mail server, and all ten individuals with recipeint.com email addresses would receive an email with the exact same tracking code.   Accordingly, because the ten emails could not be differentiated by the sender's system, the sender would receive very imprecise information regarding which of the ten emails were opened and/or which emails resulted in a "click-through" to a website.[18]

In order to overcome such problem, the specification in iHance's patents describes a system for creating copies of an

---

[18] The above summary of the traditional method of processing emails was explained by iHance.  Eloqua has not disputed the accuracy of such information.

email on the front end.    That is, copies are created on the
sender's server, a unique tracking code is inserted into each
copy, and the sender's server routes the ten modified emails
with unique tracking codes to the recipient.com server.    Under
this method, each recipient will receive an email with a unique
tracking code,    and    the    sender    will    later    receive    precise
information regarding which of the ten emails were opened and/or
which    emails    resulted    in    a    "click-through"    to    a    website.
However,    as    discussed    below,    even    with    this    "precise"
information    identifying    a    specific    opened    email    or    specific
clicked hyperlink, the specification clearly indicates that the
claimed system does not identify a "specific recipient" with
absolute certainty.    Accordingly, Eloqua's proposed construction
of the instant term is not appropriate.

        As    already    noted,    the    claim    language    at    issue    does    not
include the terms "individually" or "specific," and a review of
the claim language as a whole does not appear to support reading
such words into all claims.    On the contrary, it appears that,
in both patents, dependent claims that follow Claim 1 add the
additional    features    that    create    copies    and    insert    unique
tracking codes into each copy, thereby permitting the system to
come closer to identifying whether a specific email recipient
opened a modified email.    Because such additional features are
added in dependent claims, they presumably do not exist in the

independent claim and should not be inserted by the Court. See Andersen Corp. v. Fiber Composites, LLC, 474 F.3d 1361, 1369 (Fed. Cir. 2007) (discussing the doctrine of claim differentiation, which provides that each claim is different in scope and is based on "the common sense notion that different words or phrases used in separate claims are presumed to indicate that the claims have different meanings and scope"); Phillips, 415 F.3d at 1315 (noting that "the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim"). Furthermore, even with the functionalities that ensure that each tracked email sent to individuals on the same domain contains a unique tracking code, the specification makes clear that the patented concept does not conclusively identify a specific recipient as having opened an email, but rather, the system can only approximate the behavior of a specific email recipient.

To better illustrate the above, independent Claim 1 of the '947 patent includes the disputed language "determine whether the modified outgoing email has been opened by the email recipient" yet does not include the additional features necessary to identify and copy emails being sent to multiple recipients. Such features appear in dependent Claim 4. Accordingly, it appears improper to read into Claim 1 the

requirement that the remote server is able to "individually" determine whether a "specific" recipient has opened a tracked email because if Claim 1 is being practiced, an email sent to one recipient would be individually tracked, but an email sent to multiple recipients might not be capable of individual tracking if such recipients were on the same domain.   In contrast, if Claim 4 of the patent is being practiced, a single email addressed to multiple recipients would be duplicated within the sender's domain to insert a unique tracking code into each of the copies of the outgoing email.

Assuming arguendo that the Court concluded that all claims in the patents required a unique tracking code to be inserted into each outgoing email, the Court would still decline to adopt Eloqua's proposal.    Eloqua cites the language in the specification describing how, in a preferred embodiment, the sender's mail enhancement server is equipped to "allow each recipient to be monitored individually" by first determining how many recipients there are for a particular email and then "creat[ing] as many copies of the email as there are recipients" with each email having its own unique tracking code.   '947 6:21-30.   However, such statements, when read in conjunction with the remainder of the specification and prosecution history, indicate that the goal of the patented system is to track which specific modified email has been opened in order to best approximate

which specific recipient has opened the modified email. It would therefore be improper to read such excerpt as requiring that the sender make a 100% confirmed identification as to whether a specific recipient opened an email, primarily because emails are easily forwarded. Accordingly, even the most advanced embodiments of the system/methods claimed in the '947 and '533 patents appear only to make educated assumptions about whether an email is opened by a "specific recipient" or opened by an individual that has been forwarded such email. The specification states:

> Using the logic as described above, the system **10** is able to classify an email open event by a recipient to provide various types of information with respect to the email and the recipient opening the email. Such information includes, for example, confidence levels representing indications as to the estimated relationship between the email and the recipient opening the email, such as, whether the recipient opening the email is an intended recipient of that email or whether the email has been forwarded to the recipient by the intended recipient of that email. Such information can be displayed in different fashions or formats depending on the classification.

'947 10:51-64 (emphasis added).

Eloqua's citations to the prosecution history merely demonstrate additional examples of the same point being made by iHance. During reexamination, in an effort to highlight distinctions between the prior art and the '947 patent, iHance repeatedly took the position that the prior art clearly did not involve use of a "typical e-mail client" because the prior art

never addressed the inherent challenges in sending an email to multiple recipients on the same domain.   <u>See</u> PTO Filing, ECF No.52 Ex.3.   None of the excerpts relied on by Eloqua, however, suggest that iHance ever claimed that its patents required the system to definitively determine that a <u>specific user</u> opened an email.   Rather, it appears that iHance discussed the system's ability, in some embodiments, to definitively determine that a specific email <u>addressed to a specific user</u> was opened. Eloqua's proposed construction, which would require that the claimed system individually identify the specific recipient opening the email, is therefore rejected.

Having found that iHance's proposed construction improperly re-writes the disputed claim language to expand its meaning and reduce the claimed functionality of the remote server, and Eloqua's proposed construction improperly imports a limitation into the claims, the Court declines to adopt either construction as proposed.   The Court adopts a construction substantially similar to that proposed by iHance as iHance's construction appears to more closely track the disputed claim language.   The Court, however, rejects iHance's attempt to eviscerate the meaning of the language "able to determine," and in an effort to provide clarity and avoid presenting a question of law to the jury, the Court adopts a construction whereby "able to determine" is replaced with the phrase "capable of determining."

c. Construction

**"upon receipt of the [associated] tracking code by the remote server, the remote server is capable of determining whether the [corresponding] modified outgoing email has been opened by the email recipient"**

## 8. *"a copy of the [examined] outgoing email"*

a. Proposed Constructions

**iHance:** *"an email with the same body as the [examined] outgoing email"*

**Eloqua:** *"An identical duplicate of the outgoing email, including the same message field, subject field, and identity fields (such as the To, Cc, and Bcc fields)."*

b. Discussion

As discussed herein, the Court adopts iHance's construction of the above term, the dispute turning solely on the meaning of the word "copy." Although neither iHance nor Eloqua has persuasively demonstrated that a "copy" of an email has a specific meaning in the field, nothing in the intrinsic record supports Eloqua's proposal that the word "copy" is limited to an "identical duplicate," including the retention of all identity fields (such as cc:, bcc:, etc.). Nothing within the claims, specification, or prosecution history suggests that an email tracking system that is configured to create "copies" of an outgoing advertising email addressed to numerous potential customers that did not retain identical identity fields would not qualify as a "copy." To the contrary, the patents make clear that the purpose of making such "copy" is a workaround to

the traditional method of processing emails to ensure that each email recipient receives an email with a unique tracking code. The patents fail, however, to imply that there are substantial restrictions regarding what a "copy" must entail.

Eloqua, which seeks to add a restriction to the disputed term requiring that a copy be an "identical duplicate," fails to point to intrinsic or extrinsic evidence indicating that such restriction is appropriate.  Although the specification does discuss a preferred embodiment that envisions maintaining the "recipient identity fields (such as, 'To', 'Cc' and 'Bcc', etc.) for each copy of the email," such statement is far from sufficient to establish that an identical duplicate is required in all embodiments that involve making a "copy" of the outgoing email.  '947 6:26-34; see Brookhill-Wilk 1, 334 F.3d at 1301 ("The statements from the description of the preferred embodiment are simply that-descriptions of a preferred embodiment . . . [which] do not indicate that the invention can only be used in such a manner.").

First, nothing in the claims, specification or prosecution history suggests that producing an "identical copy" is a global requirement as opposed to an explanation of a preferred embodiment.  Second, even if identity fields were required to be maintained, the statement in the specification cited by Eloqua doesn't reference the "subject" field of the email, nor does it

otherwise indicate that there is an unwavering requirement that the copies be "identical."

Turning to iHance's proposed construction of "copy," requiring that only the body of the email be the same, the Court begins by noting that the patent does not expressly state what is necessary to constitute a "copy." However, the Court finds that such concept is exceedingly basic and that the ordinary meaning of the disputed claim language is sufficiently straight forward and involves "little more than the application of the widely accepted meaning of commonly understood words." See Acumed LLC, 483 F.3d at 805 (quoting Phillips, 415 F.3d at 1314).[19] In common parlance, when an individual requests that a friend or colleague forward a "copy" of an email, the identity fields change in the forwarded email, the subject field typically changes to indicate that such email has been forwarded (ex. "Advertising Email" becomes "Fwd: Advertising Email"). Such forwarded email, however, certainly retains its status as a "copy" of the original email. Accordingly, the word "copy" as

---

[19] The Court does not find the extrinsic evidence presented by iHance to be particularly persuasive. Such evidence consists of an affidavit of one of the inventors describing how the word "copy" is purportedly interpreted in the field. See O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd., 521 F.3d 1351, 1362 n.3 (Fed. Cir. 2008) (citing Bell & Howell Document Mgmt. Prods. v. Altek Sys., 132 F.3d 701, 706 (Fed. Cir. 1997)) ("[A]n inventor's self-serving statements are rarely relevant to the proper construction of a claim term."). Although such statements are "rarely relevant," the Court notes that Eloqua failed to provide its own extrinsic evidence on this issue.

it relates to emails appears sufficiently broad to include a copy with the same body/message field but different headers.

Similarly, considering the definition of such term in the context of the patents suggests a broad meaning of "copy" that would include reproductions of an email with "the same body" as the original.  Notably, the "Background of the Invention" in the specification expressly discusses the use of tracked emails "for a marketing campaign."  Although the patents are not limited to such purpose, they repeatedly discuss it.  See, e.g., '947 4:31 (discussing "promotional or marketing emails"); '947 13:10-36 (discussing a cross-promotional or partnering arrangement that advertises two companies websites).  Nothing in the intrinsic record suggests that if an advertising email is sent out to 1,000 recipients, and the system makes 1,000 "copies" of such email, that each recipient must receive an email that retains all 1,000 recipient email addresses in the header.  Retaining such addresses makes little sense for advertising, and eliminating such addresses does not mean that the email, which was drafted once, was not "copied" 1,000 times.

Dictionary definitions of the word "copy" similarly suggest that a similar, but not identical, reproduction is within the meaning of such word.  See OxfordDictionaries.com ("a thing made to be similar or identical to another") (emphasis added); Merriam-Webster.com ("an imitation, transcript, or reproduction

of an original work"). As nothing before the Court suggests
that the word "copy" as used in the patents requires an
"identical duplicate" of all parts of an electronic message,
including parts that have limited, if any, relation to the
content of the message actually delivered, the Court finds that
Eloqua's proposed construction is overly restrictive. In
contrast, iHance's proposed construction of such term, as used
in the patent, is in line with the well-accepted ordinary
meaning of the term "copy," common understanding of email
messages, and the concept of the portion of the patents that
focus on inserting unique tracking codes into the same message
distributed to multiple email recipients. The Court therefore
adopts iHance's construction.

    c. Construction

**"an email with the same body as the [examined] outgoing
email"**

### 9. *"monitoring website behavior of an email recipient"*

    a. Proposed Constructions

**iHance:** *"monitoring an email recipient's interaction with a
website"*

**Eloqua:** *"Individually tracking which parts of a website are
visited by each email recipient."*

    b. Discussion

The competing constructions for the above term offered by
the parties result from a disagreement as to the meaning of the

phrase "website behavior."  As with many of the disputed terms,
iHance contends that such term has a broad meaning that is not
restricted by the intrinsic or extrinsic record.  In contrast,
Eloqua seeks a restrictive construction.  According to the
parties, at the heart of this dispute is whether clicking a
hyperlink in an email that directs the user's browser to a
website qualifies as "website behavior."  Although it is
informative to know the crux of the true dispute, which is
rooted in Eloqua's product, the Court's claim construction
focuses on the patents themselves, not the products that
implicate such patents.  Here, nothing in the intrinsic or
extrinsic record supports a restrictive interpretation of the
word "behavior," and the Court therefore adopts iHance's
proposed construction.

Eloqua's proposed construction for "monitoring website
behavior" is limited to tracking which specific website pages
are viewed.  At the Markman hearing, Eloqua's counsel conceded,
as was necessary, that such construction is overly restrictive
and contradicts clear statements in the specification.[20]  Such
construction would improperly exclude tracking the time that

---

[20]  Eloqua acknowledged at the Markman hearing that its proposed
construction was too restrictive and candidly admitted that Eloqua's
only goal was to ensure that the construction of "website behavior"
excluded clicking through to a website from an email.  Markman Tr. 94.
Although Eloqua was straightforward in defining its position that a
"click-through in an email [is] email behavior, . . . not website
behavior," id., Eloqua failed to persuasively demonstrate that the
intrinsic record so limited the word "behavior" such that it should be
narrowly construed.

each web page is visited, something not only within the common meaning of the word "behavior," but also expressly referenced in the specification.  See '947 13:5-9 (indicating that a preferred embodiment of the claimed system provides "behavior reports" that can include reports "detailing activities conducted on the corporate website, such as pages viewed etc." or "web behavior analysis . . . [revealing] exactly what pages of the corporate website each prospect viewed and for how long").  Although it conceded a flaw with its proposal, Eloqua still argued that website behavior only encompasses conduct that occurs after a user has been directed to a website and cannot include tracking how the user reached such website.

As with previous terms, Eloqua cites as support for its construction the prosecution history involving iHance's explanation of the inherent problem in tracking emails sent from an email client to multiple recipients on the same domain.  The Court does not, however, find that iHance's position during reexamination with regard to such issue has any significant bearing on the proper construction of "website behavior." Notably, regardless of whether a system is limited to only tracking whether an email is opened, or whether it gathers detailed data of individual web pages visited and for how long, it is obviously desirable for the sender to know which email

generated such activity.   Accordingly, such discussion does not shed any light on the proper construction of "website behavior."

The Court does, however, find that a different portion of the prosecution history is relevant to construing the instant term since during the BPAI hearing on the '533 patent, iHance squarely addressed the meaning of website behavior.   The following exchange occurred:

> Judge: All of your claims, they start out with a system for monitoring website behavior. What are we talking about?  . . . [T]ell us what the monitoring is.
>
> iHance: . . . [W]hen a person would access the site, information is gathered and recorded. . . . It is providing information that would be useful, for example, for a sales person to go ahead and have information on how effective--
>
> Judge: You are talking about things like how often the user accesses the website and when?
>
> iHance: How often and when, whether they are the primary person who has received this or a secondary person who has received this.
>
> Judge: You associate the identifier with the recipient, and then later on you use that identifier to keep track of who is accessing the website; something like that?
>
> iHance: Yes.   It's really to provide meaningful information to improve and monitor the effectiveness of these modified types of emails.

ECF No. 52 Ex.5 at A116. Although such statements are not alone conclusive, the fact that iHance explained website behavior broadly to the BPAI to include "how often and when" a website is viewed, as well as whether it can be determined if the individual viewing the website was a primary email recipient or

a secondary email recipient, offers strong support for an expansive meaning of the term "behavior." No statements made by iHance during the reexamination suggest an intent to limit the reach of such term.

Comparing the claim language across the two patents, the claims of the '947 patent focus on monitoring "email behavior" whereas the claims of the '533 patent focus on monitoring "website behavior."[21] Considering the claims, as informed by the specification, it is readily apparent that "email behavior" includes whether a recipient opens an email. See, e.g., '947 Claim 1 ("A system for monitoring email behavior of an email recipient . . . wherein . . . the remote server is able to determine whether the modified outgoing email has been opened by the email recipient."). On the opposite end of the spectrum, there appears to be no dispute that tracking which specific web pages are viewed, and/or how long each of such pages are viewed, constitutes "website behavior." See '947 13:5-9; Markman Tr. at 94 (counsel for Eloqua acknowledging that "website behavior" can involve monitoring more than which parts of a website are visited). What remains undefined by the patent is whether clicking on a hyperlink in an email that then directs an individual to a website qualifies as "email behavior," "website behavior," or both email and website behavior. Ultimately,

---

[21] The phrase "website behavior" only appears once in the claims of the '947 patent—claim 32.

however, the Court's role is not to unduly focus on the concept of a click-through, but is instead to properly construe the disputed term "website behavior."

The broad word "behavior" is not expressly defined in the claims or specification, nor is it otherwise restricted by the intrinsic record. Although the specification does discuss a preferred embodiment generating detailed reports as to the specific web pages viewed and for how long, nothing therein suggests that more basic tracking of discrete "visits" to a website is outside the realm of "website behavior."[22]  Linear Technology Corp. v. International Trade Comm'n, 566 F.3d 1049, 1057-58 (Fed. Cir. 2009) ("We have repeatedly held that, even in situations when only one embodiment is disclosed, the claims generally should not be narrowed to cover only the disclosed embodiments or examples in the specification."). Although not dispositive of the appropriate construction, the Court notes that when a website hyperlink is clicked, a website is opened and the individual clicking the hyperlink has interacted with the opened website, if only to view the initial landing page. Under the common definition of the word "behavior," such

---

[22] Again, although the Court does not focus on determining whether a "click-through" is website behavior, the Court notes that such event may reveal to the sender more information than merely the fact that a website was visited, including information about when the website was visited, who visited the website, and whether they visited it on only one occasion, or saved the email and later clicked on the hyperlink a second or third time.

interaction with the website appears to be a form of "website behavior." See OxfordDictionaries.com ("the way in which one acts or conducts oneself . . ."); Merriam-Webster.com ("the manner of conducting oneself"). Notably, even if the tracking of such event generates very basic information—a record of a discrete visit to the website at a specific point in time—such information still establishes that a <u>website was in fact accessed</u>, which demonstrates not only that an email was opened, but that the email effectively drove a reader to visit the desired website. In adopting a construction of the instant term, the Court considers the fact that it is undisputed that the claim language "email behavior" is broad enough to include merely opening an email; it therefore appears consistent that "website behavior" is broad enough to include merely opening a website.

Based on the common meaning of the word "behavior," the lack of any limitations to such meaning as set forth in the claims, the specification, or the prosecution history, and the fact that iHance suggested a broad meaning of such term when questioned by the BPAI, the Court declines Eloqua's invitation to read a restriction into such disputed claim term and adopts iHance's proposed construction.

c. <u>Construction</u>

**"monitoring an email recipient's interaction with a website"**

### 10. "*a website referenced by the hyperlink*"

#### a. Proposed Constructions

**iHance:** "*a website served to the email recipient as a result of the email recipient clicking on the hyperlink*"

**Eloqua:** "*The website containing the webpage identified in the hyperlink in the outgoing email*"

#### b. Discussion

The Court ordered additional briefing regarding the proper construction of disputed terms 10 and 11.  Although such briefing was instructive, the fact remains that there is little, if any, relevant intrinsic evidence that helps clarify the proper meaning of either term.  Having carefully considered all the arguments before the Court, the Court adopts iHance's proposed construction of disputed term 10.

According to the parties, the reason for the claim construction dispute as to the instant term is rooted in the ability to use a "redirect" link to track internet behavior.  As explained by the parties, a hyperlink can be modified to redirect an individual's browser to one website for the purposes of tracking, and then, as a second step, the user's browser is directed to the website the individual intended on visiting. Such routing can apparently be effectuated without the knowledge of the individual that clicked on the hyperlink.

As the Court indicated in its Order instructing the parties to file additional briefs, and as repeated above, the Markman process does not require the Court to resolve whether Eloqua's system, which apparently utilizes redirect links, falls within, or is excluded from, the claims in dispute. See SmithKline Beecham Corp., 403 F.3d at 1340 ("[The Federal Circuit] has repeatedly stated that a court must construe claims without considering the implications of covering a particular product or process."). Such infringement determination will ultimately be made by the jury. Rather, here, following accepted rules of construction, the Court is called upon to adopt a legal construction for the disputed claim terms.

Considering first whether the claim language at issue should be interpreted as limiting a hyperlink to referencing a single website, or permitting a "reference" to more than one website, the applicable rules of construction do not support limiting the disputed claim language to "referencing" a single website. The Federal Circuit has "repeatedly emphasized that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" Baldwin Graphic Systems, Inc. v. Siebert, Inc., 512 F.3d 1338, 1342 (Fed. Cir. 2008) (quoting KCJ Corp. v. Kinetic Concepts, Inc., 223 F.3d 1351, 1356 (Fed. Cir. 2000)). Such rule of construction is just that,

"a rule, rather than merely . . . a presumption or even a convention," and the exceptions are "extremely limited: a patentee must evince a clear intent to limit 'a' or 'an' to 'one.'" Id. (internal quotation marks and citations omitted). For such a limited exception to apply, "the language of the claims themselves, the specification, or the prosecution history [must] necessitate a departure from the rule." Id. at 1343.

Here, the disputed language, which follows the word "comprising," includes the indefinite article "a" prior to the language "website referenced by the hyperlink" and nothing in the "language of the claims themselves, the specification, or the prosecution history . . . contain[s] a clear indication that the applicant departed from the general rule for the article 'a.'" Id. Accordingly, the Court finds that the disputed claim term must be interpreted in a manner consistent with the concept that a hyperlink can reference one or more websites.

Second, the Court addresses whether a hyperlink "references" webpages actually served as a result of an individual clicking on the hyperlink, or whether it references the website "identified" in the hyperlink. As previously indicated, there is virtually no guidance in the intrinsic record regarding what it means for a website to be "referenced"

by a hyperlink.[23]   iHance correctly recognizes that the context of the disputed claim language establishes that the hyperlink at issue is the modified hyperlink that is clicked on by an email recipient, as opposed to the unmodified hyperlink in the originally composed email.   Such interpretation is dictated by the fact that immediately prior to the disputed claim language, the patent states "wherein upon the email recipient clicking on the hyperlink . . ."   '533 Claim 1.   Because the email recipient necessarily clicks on a modified hyperlink, the subsequent statement "a website referenced by the hyperlink" contextually refers to the modified hyperlink.

In comparing the parties' proposals, and based on the lack of intrinsic evidence, the Court considered the dictionary definitions of "hyperlink."   Such definitions suggest that the text of a hyperlink itself need not "identify" any webpage.   See Merriam-Webster.com (defining hyperlink as "an electronic link providing direct access from one distinctively marked place in a hypertext or hypermedia document to another in the same or a different document") (emphasis added); OxfordDictionaries.com

---

[23] Eloqua cites a portion of the specification discussing a preferred embodiment where an email originating from Company X includes a hyperlink "to Company X's website or any other website associated with Company X."   '533 11:40-46.   Although such example plainly indicates that clicking on a hyperlink "to Company X's website" will in fact take an email recipient to Company X's website, such excerpt fails to illuminate the concept of "referencing" such website—i.e., did the link "reference" Company X's website because the link itself "identified" such destination, or because the link actually took the browser to such destination.

(defining hyperlink as "a link from a hypertext file or document to another location or file, <u>typically activated by clicking on a highlighted word or image on the screen</u>") (emphasis added).[24]

Eloqua's proposed construction of the instant term is flawed because: (1) it appears to indicate that only one webpage can be referenced by a hyperlink; (2) it appears to refer to the unmodified hyperlink in the outgoing email, as opposed to the modified hyperlink in the modified outgoing email; and (3) it appears to assume that a hyperlink itself must identify a webpage. In contrast, iHance's proposed construction retains the indefinite article "a" in front of the word website, focuses on the modified hyperlink, and focuses the construction on the website actually served once a link is clicked, which is in line with both of the dictionary definitions cited above. Such definitions indicate that a hyperlink is an electronic link to another place, or to another location, or to another file, and absent any intrinsic or extrinsic evidence to the contrary, the Court finds the appropriate construction of a website "referenced" by such a link is a website served to an individual

---

[24] Although hyperlinks often expressly identify a web location, such as "*http://www.widget.com*," a hyperlink may also take the following form "click *here* to visit widget.com." In the latter example, the word "*here*" is the hyperlink, yet the link itself does not "identify" the location to which a user will be directed.

after they activate such link.· Accordingly, the Court adopts

iHance's proposed construction.[25]

c. Construction

**"a website served to the email recipient as a result of the email recipient clicking on the hyperlink"**

**11. *"the remote server being used to manage a website referenced by the hyperlink"***

a. Proposed Constructions

**iHance:** *"the remote server being the subject of a request by a website served to the email recipient as a result of the email recipient clicking on the hyperlink"*

**Eloqua:** *"The remote server controls access to and provides the content of the website referenced by the hyperlink."*

b. Discussion

Although claim 11 is raised separately to focus on the dispute as to what it means to "manage" a website, the second half of disputed claim term 11 is actually disputed term 10. The Court will therefore interpret the latter half of term 11 in the same manner outlined in the preceding section. As to the first half of term 11, the Court finds that iHance's proposed construction is unduly broad and, without any intrinsic or

---

[25] As repeatedly indicated herein, the Court's construction does not turn on the real-world implementations of either party. The Court adopts iHance's construction because it appears to appropriately clarify the disputed claim language. Whether a specific redirect link actually implemented in practice, which may operate to take a user to an intermediate website without the user's knowledge, falls within or outside of such construction, is a matter for the jury. See Acumed LLC, 483 F.3d at 806 ("[A] sound claim construction need not always purge every shred of ambiguity. The resolution of some line-drawing problems . . . is properly left to the trier of fact.").

persuasive extrinsic support, deviates from the plain meaning of the word "manage." Eloqua's proposed construction, which focuses on controlling access and providing content of a website, appears closer to the appropriate construction of this term, yet likewise finds no support in the intrinsic record and limited extrinsic support. Accordingly, the Court adopts a construction of the first half of the disputed term that draws from the plain meaning of the word "manage."[26]

Similar to the construction of term 10, construction of the instant term requires the Court to consider whether "a remote server" refers to a single server or whether it refers to one or more servers. As previously indicated, the Federal Circuit has

---

[26] The Court acknowledges that it has referenced general usage dictionaries far more frequently in the instant opinion than in a typical Markman opinion. However, extensive intrinsic context for the claim terms in dispute was simply not available in this case. Such lack of internal clarification, however, is unsurprising in that many of the disputed terms are basic everyday words ("associated," "capable," "copy," "behavior," and "manage") that are easily understood. See Phillips, 415 F.3d at 1314. ("In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent . . ., and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words."). The Court further notes that none of the constructions adopted herein "rise or fall based on the preference of a particular dictionary editor" or the Court's preference for one definition over another. Id. at 1322. Rather, the dictionary definitions considered by the Court were used primarily to illustrate that a specific proposed construction was unduly broad or unduly narrow, and were an aid to the Court in adopting the "widely accepted meaning of commonly understood words," as informed by the intrinsic record. See Advanced Fiber Technologies (AFT) Trust v. J & L Fiber Services, Inc., --F3d.--, 2012 WL 1088698, at *5 (Fed. Cir. Apr. 3, 2012) (quoting Phillips, 415 F.3d at 1322-23) (reiterating the fact that courts are permitted to "rely on dictionary definitions when construing claim terms, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'").

repeatedly held that "an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" Baldwin, 512 F.3d at 1342 (quoting KCJ Corp, 223 F.3d at 1356). Important to the instant dispute, not only is the word "a" almost always properly construed to mean "one or more," but the "subsequent use of definite articles 'the' or 'said' in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning." Id. (emphasis added). Here, immediately preceding the disputed claim language "the remote server" is the following: "upon an email recipient clicking on the hyperlink, a connection to a remote server is made . . ." '533 Claim 1 (emphasis added). Accordingly, as long as the Court finds that the use of such indefinite article "a" prior to "remote server" refers to "one or more" remote servers, the subsequent use of the phrase "the remote server" reinvokes that same non-singular meaning.

A review of the intrinsic record reveals nothing that would support a deviation from the well-established rule discussed above. Although the specification does not expressly discuss the use of multiple remote servers, one portion of the specification indicates that "the various functionality of the system 10 as described above can be implemented using a number of different component configurations, in an integrated or non-

integrated manner." '947 12:11-14. Furthermore, Figure 1 uses a visual depiction of "stacked" boxes to represent the logging server, but single boxes to represent other parts of the system, which at least suggests that in some embodiments more than one server can be used to perform such logging function. '947 Figure 1. Accordingly, even though the specification does not expressly discuss the existence of multiple remote servers or multiple logging servers, some intrinsic references suggest the possibility of there being multiple servers, and certainly nothing indicates an intent to deviate from the well-established rule that the word "a" in claim language refers to "one or more."

Although the Court agrees with iHance that it would be improper to interpret the claim language to require that a system have only one "remote server," the Court rejects iHance's argument that any server that receives a request from a website "manages" such website.   The Court does not dispute iHance's contention that it is common knowledge in the art that multiple servers can be used to manage a single website, but that uncontroversial fact does not support the leap in logic that iHance proposes.  Just because more than one server can manage a website does not mean that any server, owned by any company, that receives a "request" from a website for any content can be said to "manage" that website.   Such a construction represents

an unsubstantiated deviation from the accepted meaning of the term "manage," and iHance cannot support such deviation from the intrinsic record nor from extrinsic evidence outside of the self-serving affidavit submitted by one of the inventors. See O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd., 521 F.3d 1351, 1362 n.3 (Fed. Cir. 2008) (citing Bell & Howell Document Mgmt. Prods. v. Altek Sys., 132 F.3d 701, 706 (Fed. Cir. 1997)) ("[A]n inventor's self-serving statements are rarely relevant to the proper construction of a claim term.").

Although the Court rejects iHance's proposed construction of the word "manage," the Court finds that Eloqua has likewise failed to propose an acceptable construction for such term. Because a website can upload documents, pictures, or other materials from an outside server owned and operated by an entirely different company (such as an advertisement banner at the top of the screen), the Court does not believe that it is appropriate to define "management" of a website in a manner that would require any server to deliver 100% of the website's content. Similarly, Eloqua fails to demonstrate that a server must "control access to" a website in order to be said to "manage" that website as such language suggests a requirement that the server perform some security function, and nothing in the intrinsic record, nor the extrinsic record advanced by Eloqua, supports such requirement.

The Court therefore again finds itself in the position where it must resort to dictionary definitions of the word "manage" in order to aid in construction of the disputed term. Neither party submits a technical dictionary or other technical source that provides an industry specific definition. Accordingly, the Court turns to general usage dictionaries.

As expected, there are numerous definitions for the term "manage." Oxford Dictionary defines "manage" as: "[with object] be in charge of (a company, establishment, or undertaking); administer; run." OxfordDictionaries.com. Similarly, the definitions provided by Merriam-Webster Dictionary include: "to handle or direct with a degree of skill"; and "to exercise executive, administrative, and supervisory direction of." Merriam-Webster.com. Eloqua's supplemental brief on terms 10 and 11 likewise acknowledges that the ordinary meaning of "manage" is "to exert control over." Eloqua Supp. Brief at 6, ECF No. 113. Eloqua later suggests that a server that manages a website is the server that is "hosting, controlling and transmitting the website." Id. at 7.

A review of the intrinsic record provides no indication that the patentee intended the word "manage," as used in the claims, to take on any special meaning other than its well-accepted common definition. Accordingly, the Court adopts a construction of this disputed term that: (1) as argued by

iHance, indicates that multiple servers can manage a website; (2) as argued by Eloqua, requires that the server(s) exert control over a website and not merely be a server that is the subject of a request by such website; (3) incorporates the plain meaning of the term "manage" as contrasted with the overly broad meaning advanced by iHance and the overly restrictive meaning proposed by Eloqua; and (4) reproduces the construction of term 10 as the latter half of disputed term 11.

c. Construction

**"the remote server or servers that are responsible for, and are being used to administer, a website served to the email recipient as a result of the email recipient clicking on the hyperlink"**

## IV. ALLEGED DISCLAIMER OF TEMPLATES

Eloqua argues in its claim construction briefs that, through the course of the PTO reexamination, iHance disclaimed a system or method for tracking emails that relied on the use of "templates."[27] iHance, unsurprisingly, opposes such contention. Having reviewed the arguments on such issue, the Court declines to resolve such matter herein as part of its Markman opinion. Such dispute is not tied to any specific claim language, and Eloqua does not propose a construction of any disputed claim

---

[27] It appears clear that during reexamination, iHance contrasted its invention with prior art that did not use a typical email client to send tracked emails, but instead could only achieve tracking through the use of a program with predefined templates. The question that appears to remain is whether in making such statements, iHance disclaimed the use of templates within a typical email client.

term in a manner that demonstrates that the use of templates is prohibited.    The Court will address such matter, which appears more akin to a summary judgment non-infringement argument, at a later time.

## V. CONCLUSION

For the reasons set forth above, the Court issues this Opinion and Order as the construction of the disputed claim terms in the '533 and '947 patents.

The Clerk is **REQUESTED** to send a copy of this Opinion and Order to counsel of record for the parties.

It is so **ORDERED**.

/s/ _____

_____
Mark S. Davis
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
May 2 , 2012